**REED SMITH LLP**
*Formed in the State of Delaware*
Murray J. Klein, Esq.
Steven B. Roosa, Esq.
David E. Dopf, Esq.
Princeton Forrestal Village
136 Main Street, Suite 250
Princeton, New Jersey 08543-7839
Tel. (609) 987-0050
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IJKG OPCO LLC d/b/a BAYONNE<br>HOSPITAL CENTER<br>29th St. and Avenue E.<br>Bayonne, New Jersey 07002,<br><br>and<br><br>JOHN GODINSKY, M.D.<br>76 West 50th Street<br>Bayonne, New Jersey 07002,<br><br>Plaintiffs,<br><br>            v.<br><br>HORIZON HEALTHCARE SERVICES,<br>INC. d/b/a HORIZON BLUE CROSS AND<br>BLUE SHIELD OF NEW JERSEY<br>3 Penn Plaza East, PP15-F<br>Newark, New Jersey 07105,<br><br>Defendant. | CIV. NO: |

### COMPLAINT AND JURY DEMAND

IJKG OPCO LLC, d/b/a Bayonne Hospital Center (hereinafter, "Bayonne"), states by and

through its undersigned counsel by way of Complaint against Horizon Healthcare Services, Inc.,

d/b/a Horizon Blue Cross and Blue Shield of New Jersey ("Horizon") the following:

## NATURE OF THE CASE

1.     This case has been filed to compel Horizon to stop interfering with the delivery of emergency medical care at Bayonne. Horizon undertakes this course of unfair, wrongful, unlawful, and fraudulent practices with complete disregard for the life threatening consequences to a patient, by: (i) harassing and coercing patients that are receiving emergency medical treatment at Bayonne so that those patients will, against the medical advice of independent, treating physicians, either cut short their emergency medical treatment, suffer a needless and life-threatening transfer to one of Horizon's participating providers, or thereafter, go to another hospital's emergency room just to avoid the harassment and confusion created by Horizon, (ii) unlawfully and arbitrarily denying and reducing coverage to patients for the emergency medical treatment that they have received at Bayonne, and (iii) based on the foregoing, deterring patients, in advance, from seeking emergency medical treatment at Bayonne when the emergency room at Bayonne is the one that is nearest to, and most quickly accessible by, such patients.

2.     Bayonne has done, and is doing, everything that it is able to do in order to assure that patients requiring emergency care go to the nearest emergency room for care. Bayonne has stated publicly and repeatedly that Horizon is required to limit a patient's liability to their in-network liability if the patient comes to Bayonne's emergency room, just as Horizon must limit the patient's liability if the patient goes to any other hospital's emergency room. This effort stems not only from Bayonne's commitment to its communities, but is also compelled by law. Under the Emergency Medical Treatment and Active Labor Act ("EMTALA") and implementing regulations (42 U.S.C. § 489.24), and the Health Care Cost Reduction Act, N.J.S.A. 26:2H-18.64, Bayonne and those physicians who staff its Emergency Department must

- 2 -

provide appropriate emergency medical care to each and every individual who seeks treatment at Bayonne, regardless of the patient's insurance or financial status.

      3.     Bayonne is not part of Horizon's contracted consortia of "in-network" hospitals, and is, instead, an "out-of-network" facility providing such care to Horizon's subscribers. Horizon, on an ongoing basis and in direct violation of applicable law, is currently engaged in multiple unfair, wrongful, unlawful, and fraudulent schemes, with complete disregard for the life-threatening consequences to a patient, to prevent its subscribers and beneficiaries from utilizing Bayonne's out-of-network emergency medical care services. This conduct, aside from being unlawful, demonstrably and immediately threatens the lives and well-being of numerous residents in Hudson County, New Jersey and must be stopped.

      4.     Horizon knowingly engages in its various unfair, wrongful, unlawful, and fraudulent schemes, with complete disregard for the life-threatening consequences to a patient's health. To this end, Horizon has also engaged in, among other things, the following unlawful conduct: (i) intimidating patients in numerous contexts, including determining, without ever examining the patient, that the patient is stable for transfer from Bayonne to an "in-network" hospital in direct contravention of federal and State laws that require the patient's attending physician to make this determination, and then harassing the patient, the patient's family, and/or the treating physician to make the transfer regardless of the patient's actual medical condition, (ii) harassing and intimidating physicians who have privileges at, or who refer patients to, Bayonne or other out-of-network hospitals, (iii) under-reimbursing Bayonne for emergency, inpatient, and outpatient services, and (iv) misrepresenting to insureds, employers, and the general public that Bayonne's medical emergency services are prohibitively expensive and that accessing care at Bayonne will subject patients and their families to inordinate financial liability.

- 3 -

5.     Horizon engages in this illegal conduct in order to increase its profit margins, while providing less than the level of coverage that was actually sold to its subscriber patients and other beneficiaries. Under applicable federal and State law, Horizon owes its subscribers and other beneficiaries an unqualified and absolute duty of loyalty and utmost good faith, defined in part under law as an obligation to make decisions solely in the interest of subscribers and other beneficiaries, while avoiding all self-dealing or financial arrangements that benefit Horizon at the expense of the health and well-being of such persons. Horizon also accepts premium payments intended to purchase coverage for emergency services, including those provided by out-of-network providers, while systematically failing to honor its coverage obligations. It is demonstrably fraudulent and illegal for Horizon to collect premium payments for coverage (including emergency and urgent coverage for out-of-network services) and then take actions designed to limit the use of out-of-network emergency and urgent hospital services solely to increase its profitability. Nevertheless, that is exactly what Horizon is doing.

6.     Horizon also targets "out-of-network" providers like Bayonne to illegally enhance its own consortia of "in-network" providers. As related elsewhere in this Complaint, Horizon uses its considerable power to either prevent its subscribers and beneficiaries from going to Bayonne's out-of-network Emergency Department or to coerce subscribers and beneficiaries to seek emergency care only at in-network facilities. Applicable law absolutely forbids this conduct in the following respects: (1) these laws compel Horizon to honor the decisions of subscribers and beneficiaries who have a medical emergency condition and who seek care at the nearest emergency department; (2) these laws affirmatively require Horizon to compensate Bayonne for emergency medical treatment provided to such persons—indeed, such compensation, under law, must be provided by Horizon regardless of whether emergency medical services were provided

by an in-network provider or an out-of-network provider; and (3) Horizon's non-profit corporate charter, and the express and exclusive terms of the special New Jersey legislation under which Horizon conducts its charitable mission, strictly require Horizon to be operated exclusively as a charitable and benevolent corporation for the promotion of the common good and the public health of all communities in New Jersey, not just those communities unilaterally chosen by Horizon because of the location of its in-network provider hospitals.

7.      When Horizon acts illegally to undermine the ability of out-of-network hospitals like Bayonne to provide emergency care in accordance with law for the purpose of augmenting its in-network financial empire, it places its own profits ahead of the healthcare needs of approximately Three Million Nine Hundred Thousand (3,900,000) Horizon subscribers and beneficiaries. This conduct blatantly violates not only Horizon's charitable corporate mission under New Jersey law but also its fiduciary duty of care to subscribers and beneficiaries by, among other things, jerry rigging the amounts paid to subscribers and beneficiaries as plan benefits based on maximizing profits for Horizon, rather than paying benefits based on the terms of the plans and applicable statutes and regulations.

8.      Still another unlawful purpose of Horizon's campaign against out-of-network hospitals is to fatten its reserves, enable the payment of "Wall Street" bonuses to one or more key Horizon executives and position Horizon for its planned conversion from a New Jersey nonprofit organization to a publicly held stock exchange company. Horizon's Chief Executive Officer William Marino boastfully informed reporters in a recent interview that Horizon's reserves are more than One Billion Six Hundred Million Dollars ($1,600,000,000), a sum which as of 2008 was the largest in the company's three-quarter century history. *See Asbury Park Press* — Sunday, September 21, 2008. Horizon paid Mr. Marino salary and bonus in the

- 5 -

aggregate amount of Four Million Nine Hundred Eighty Three Thousand Two Hundred Fifty

Four Dollars ($4,983,254) in 2007. *AIS Report on Blue Cross Blue Shield Plans,* November,

2008.

        9.     It is not a coincidence that Horizon's campaign of illegal intimidation,

harassment, threats, and fraud comes at the very moment that Horizon plans to end 76 years of

operating as a not-for-profit corporation in New Jersey. On August 15, 2008, Horizon filed an

application with the New Jersey Department of Banking and Insurance ("NJDOBI") to convert

from non-profit to for-profit status. Its application remains pending before NJDOBI and the

Office of the Attorney General of the State of New Jersey and it has not been deemed complete

by either State agency. Nevertheless, Horizon has gone ahead with its plan to obtain approvals

for issuance of public stock, including new classes of shares designed to be issued pursuant to a

public underwriting in accordance with the Securities Act of 1933 and, most ominously, shares

of stock designed solely for purposes of being issued pursuant to executive stock options or other

compensation based programs. *Horizon Plan of Conversion To A Domestic Stock Insurer and

Exhibits,* August 15, 2008.

        10.     Horizon's unlawful conduct towards Bayonne is part of a much larger, ongoing

scheme in which Horizon seeks to illegitimately enhance its "in-network" market power as well

as its Wall Street value by unlawfully interfering in the provision of care at, and the business

operations of, many out-of-network providers. In recent months, Horizon has filed lawsuits

against small, out-of-network New Jersey community hospitals, including Bayonne, seeking to

coerce these facilities to significantly reduce the emergency medical services they provide to

Horizon subscribers and to compel the result that such patients seek care primarily from

participating Horizon hospitals so that Horizon can increase its own profits. *Horizon Blue Cross*

- 6 -

*Blue Shield of New Jersey v. Newton Memorial Hospital* Superior Court of New Jersey, Essex

County, Chancery Division Docket Number Essex-C-141-09; *Horizon Blue Cross Blue Shield of*

*New Jersey v. IJKG OPCO, LLC, et al* Superior Court of New Jersey, Essex County, Chancery

Division Docket Number Essex-C-125-09. Indeed, in 2008 and 2009, Horizon itself has been

sued by numerous providers as the last resort of these medical facilities to defend against

Horizon's illegal tactics. *Capital Health System v. Horizon Blue Cross Blue Shield of New*

*Jersey* Superior Court of New Jersey, Essex County, Law Division Docket Number Essex-L-

003980-09; *Newton Memorial Hospital v. Horizon Blue Cross Blue Shield of New Jersey*

Superior Court of New Jersey, Sussex County, Law Division Docket Number SSX-L-302-09;

*UFCW Local 152 Health & Welfare Fund, et al v. Horizon Healthcare Services, Inc.* U.S.

District Court, District of New Jersey (Newark) Docket Number 2:09-cv-00280-WJM-MF;

*Becker, M.D. et al v. Horizon Blue Cross Blue Shield of New Jersey, Inc.* U.S. District Court,

District of New Jersey (Newark) Docket Number 2:09-cv-01154-SRC-MAS; and *Glen Ridge*

*Surgicenter, LLC v. Horizon Blue Cross Blue Shield of New Jersey, Inc.* U.S. District Court,

District of New Jersey (Newark) Docket Number 2:08-cv-06160-JAG-MCA.

11.    As stated elsewhere in this complaint, Bayonne seeks the Court's protection and

affirmative relief in order to cause Horizon to permanently halt all activities designed to prevent

Bayonne from providing emergency medical services and related health care to residents of the

communities it serves, in compliance with federal and state law and in furtherance of its

substantial commitment to accessible emergent and non-emergent health care to residents of

Hudson County, New Jersey.

## JURISDICTION

12.     This case arises under the Sherman Act, ERISA, the Lanham Act, and various laws of the State of New Jersey.  The United States District Court for the District of New Jersey has subject matter jurisdiction over the federal claims set forth in this lawsuit, pursuant to 15 U.S.C. § 1 et seq.; 15 U.S.C. § 12, et seq.; 15 U.S.C. 1125, et seq.; and 29 U.S.C.  § 1001, et seq. Furthermore, this Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all of the claims in this Complaint arising under the laws of the State of New Jersey.

## VENUE

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## THE PARTIES

14.     The Plaintiff, Bayonne, is a privately held limited liability company under the laws of the State of New Jersey with its principal place of business located at 29th St. and Avenue E., Bayonne, New Jersey.  It is a licensed general acute care hospital on the Bergen Neck Peninsula (the "Peninsula") with a 278-bed capacity consisting of 19 full-service emergency room bays, 205 medical/surgical beds, 10 obstetrical beds, 17 pediatric beds, 14 adult ICU/CCU beds and 15 adult, acute psychiatric beds.  The facility also operates 17 hospital-based, long-term, sub-acute beds.  The service complement consists of 6 inpatient operating rooms, 2 cystoscopy rooms, 1 full-service cardiac catheterization lab, 12 chronic hemodialysis stations, 1 MRI unit, emergency angioplasty services to save the lives of heart attack patients, elective angioplasty through the C-PORT E study, 2 hyperbaric chamber units, and a PET-CT diagnostic imaging unit.

15.     The Plaintiff, Dr. John Godinsky, M.D. ("Dr. Godinsky"), 76 West 50th Street Bayonne, New Jersey 07002, is a resident of the State of New Jersey and an individual who has

- 8 -

received emergency medical treatment at Bayonne. He does not currently have, and has never had, any professional affiliation with Bayonne.

16.     The defendant, Horizon, holds itself out as a not-for-profit health service corporation in the State of New Jersey, with its principal place of business at Three Penn Plaza East, Newark, New Jersey 07105. Horizon is in the business of, among other things, providing health benefits plans and policies of insurance to its insureds. Horizon is the largest health insurer in the State of New Jersey, covering approximately Three Million Nine Hundred Thousand (3,900,000) insureds or beneficiaries, and well in excess of 50% of the total number of people in the State of New Jersey who are covered by privately administered insurance.

## FACTS

## I.     Horizon—A Charitable and Benevolent Organization in Name Only.

17.     Horizon had humble beginnings. In 1929, eleven hospitals in Essex County, New Jersey formed the "Hospital Council." A few years later, at the height of the Great Depression, the organization came to be known as the Associated Hospitals of Essex County and was incorporated as a not-for-profit entity. Later in the 1930s, this charitable organization transformed into a state-wide charitable organization, known as the Hospital Service Plan of New Jersey, or "Blue Cross."

18.     In 1940, New Jersey's Legislature enacted statutes providing for the formation of non-profit medical service corporations. This gave rise to formation of The Medical-Surgical Plan of New Jersey, or "Blue Shield," which was incorporated as a not-for-profit entity on March 24, 1942. Many years passed until enactment of legislation effective on February 4, 1986, permitting the merger of Blue Cross and Blue Shield. The two corporations, as merged, remained not-for-profit and became known as Blue Cross Blue Shield of New Jersey. In 1998,

- 9 -

Blue Cross Blue Shield of New Jersey changed its name to Horizon Healthcare Services, Inc.,

doing business as Horizon Blue Cross and Blue Shield of New Jersey, the Defendant in this

matter.

19.     Horizon's incorporation authority lies under N.J.S.A. 17:48E-1 (e) and N.J.S.A.

17:48E-2 (commonly referred to as the "Health Services Corporation Act") and N.J.S.A. 15A-1

et seq. (the "New Jersey Nonprofit Corporation Act"). The Health Services Corporation Act

provisions require that Horizon operate as a not-for-profit corporation. Indeed, lest there be any

confusion, this New Jersey statute provides that "[Horizon] is hereby declared to be a charitable

and benevolent institution . . . ." N.J.S.A. 17:48E-41. Horizon's status as such was later

expressly confirmed by the New Jersey Superior Court, Appellate Division, as a key part of its

decision in *I/M/O Blue Cross and Blue Shield of New Jersey, Inc., For Conversion to a Domestic

Mutual Insurer Pursuant to N.J.S.A. 17:48E-45 to -48*, (Oct. 24, 1997).

20.     The New Jersey Nonprofit Corporation Act authorizes Horizon to conduct only

"lawful, nonprofit activities." N.J.S.A. 15A:1-1(c) (2). Horizon's activities under this law are

also limited to those without pecuniary profit. N.J.S.A. 15A:2-1a.

21.     Horizon's Certificate of Incorporation provides that it shall be "operated as and

organized as a civic corporation for the promotion of social welfare within the meaning of

Section 501(c)(4) of the Internal Revenue Code of 1954, as amended." Section 501(c)(4) of the

Internal Revenue Code of 1954 ("IRC") provides that Horizon is therefore an "organization not

organized for profit but operated exclusively for the promotion of social welfare . . . .".

Treasury Regulations governing the affairs of Horizon under this IRC section provide that: "[A]n

organization is operated exclusively for the promotion of social welfare if it is primarily engaged

- 10 -

in promoting . . . the common good and general welfare of the community." Treasury
Regulation 1.501(c)(4)-1(a)(2)(i).

22.     Concurrent with Horizon seeking to issue stock on Wall Street, there is a
continuing, and indeed an accelerating, epidemic of New Jersey hospital closures and
bankruptcies. In the past decade, twenty-one New Jersey community hospitals have closed - six
(6) have filed for bankruptcy. The closed New Jersey hospitals include: Montclair Community
Hospital; South Amboy Memorial Hospital; Point Pleasant Hospital; West Jersey Hospital,
Camden; St. Francis Hospital, Jersey City;  South Jersey Healthcare, Millville; General Hospital
Center, Passaic; West Hudson Hospital, Kearny; Hospital Center at Orange; Irvington General
Hospital; PBI Regional Medical Center; St. Mary's Hospital, Passaic; HEALTHSOUTH
Specialty Hospital, Union; Union Hospital; Pascack Valley Hospital; Barnert Hospital, Paterson;
Saint James Hospital, Newark; Liberty Health, Greenville Hospital; Columbus Hospital,
Newark; Muhlenberg Regional Medical Center; Kessler Memorial Hospital. The New Jersey
hospitals filing for bankruptcy include: Barnert Hospital, Paterson; Bayonne Medical Center;
Pascack Valley Hospital, Westwood; PBI Regional Medical Center, Passaic; Kessler Memorial
Hospital, Hammonton; and St. Mary's Hospital, Passaic. With respect to the majority of the
foregoing closures, and for all of the bankruptcies, inadequate payment for healthcare services to
community hospitals has been the major contributing factor to the facility's demise.

23.     Various communities served by these institutions have been devastated by these
closures and bankruptcies.

24.     In contrast to these New Jersey hospitals who have been forced to shut their doors
or go bankrupt, Horizon—a charitable and benevolent organization commanded by law and
charter to operate exclusively to promote the social welfare and community needs of these

- 11 -

devastated communities—has generated a war chest of more than 1.4 Billion Dollars ($1,400,000,000) in reserves and is estimated to have a market value between Seven Billion Five Hundred Million Dollars ($7,500,000,000) and Eight Billion Dollars ($8,000,000,000). *Physician's News Digest* October 2008. Horizon's glossy 2008 Annual Report trumpets operating revenues of Seven Billion Nine Hundred Sixty Million Dollars ($7,960,000,000). Not surprisingly, this same Annual Report contains not one word about the 21 New Jersey hospital closures referenced above nor any information of any kind about how Horizon intends to aid those communities that have been harmed by these involuntary closures throughout the state.

25.     Horizon, despite its charitable, benevolent and tax-exempt status, operates primarily as a profit-driven business with its primary mission being the creation of a hefty balance sheet and earnings stream incident to becoming a Wall Street company, replete with Wall Street-style compensation for senior management. There is no other explanation for Horizon's current crusade to sell stock and secure stock-trading value for executive compensation stock options and other perquisites.

26.     Within the past twelve months, Horizon has spent more than Five Million Dollars ($5,000,000) on Wall Street experts to prop up its application to convert from a charity to a Wall Street corporation, including such 'big name' players as Morgan Stanley, Goldman Sachs and Co., Towers Perrin and Booz and Co. No mention is made, in any of the 700 separate filings made by Horizon and its Wall Street experts incident to this conversion, of how Horizon presently operates exclusively for the promotion of the social welfare of the communities which it serves, including those communities, like the City of Bayonne, which witnessed its 120-year old hospital enter bankruptcy in 2007. No mention is made, in any of these filings, as to how Horizon intends to continue this mission after it becomes a Wall Street company..

27.     Horizon has attempted to direct the blame for hospital closures and insolvency away from itself and its inadequate reimbursement by suggesting that closures are the result of the large number of uninsured patients in New Jersey. However, there is nothing unique about the size of New Jersey's uninsured population. The uninsured population in New Jersey is approximately 15% of the total population, which is similar to the percentage of uninsured patients nationally. Despite New Jersey having an average-sized uninsured population, it has an atypical, and disproportionately large number of hospitals that have closed, as a percentage of the total number of hospitals in the State. Furthermore, according to the 2009 National Report Card on the State of Emergency Medicine, New Jersey ranks last among the 50 states in the number of emergency rooms per million people.

28.     Horizon's gold rush is not of recent vintage. Horizon tried to become a Wall Street company in 1996 when it filed an application to convert from a charitable and benevolent, tax-exempt organization to a stock exchange, for-profit corporation. Horizon's application at that time was deemed incomplete by NJDOBI, in part because Horizon would not agree with governmental authorities that Horizon was in fact a charity with obligations to support the community. *In The Matter of the Application of Blue Cross and Blue Shield of New Jersey, Inc., For Conversion to a Domestic Mutual Insurer Pursuant to N.J.S.A. 17:48E-45 to -48* (App. Div. N.J. Oct. 24, 1997, unpublished opinion). The Appellate Division, in its decision against Horizon, ruled unequivocally that Horizon is indeed a charitable and benevolent entity. This ruling has never been challenged, modified or vacated.

29.     In 2001, after New Jersey passed various laws governing for-profit conversions, Horizon broached the idea of converting to for-profit status but, faced with public opposition,

never followed through.  Now, as noted elsewhere in this Complaint, Horizon is once again

pursuing conversion.

      30.    And, Horizon is, once again, refusing to answer straightforward questions from

New Jersey's Attorney General regarding its charitable and benevolent status and activities. The

Attorney General has asked Horizon, nine months after it filed this application to convert and so

far without the benefit of a reply, the following:

> In In The Matter of the Application of Blue Cross and Blue Shield of New
> Jersey, Inc., For Conversion to a Domestic Mutual Insurer Pursuant to N.J.S.A.
> 17:48E-45 to -48, (App. Div. N.J. Oct. 24, 1997, unpublished opinion), the court
> found that Horizon is a "charitable and benevolent institution."  In addition,
> N.J.S.A. 17:48E-41 declares a health services corporation to be a charitable and
> benevolent institution.  Further, Horizon's Certificate of Incorporation provides
> that it shall be "operated as and organized as a civic corporation for the
> promotion of social welfare within the meaning of Section 501 (c) (4) of the
> Internal Revenue Code of 1954, as amended."  Please respond to the following
> question[s]:
>
> In the response to question 12, Horizon states that it is not a charity.  Please
> reconcile this statement with the above authorities.
>
> Question 13 relates to Horizon's charitable activities.  In connection therewith,
> please respond to the following questions:
>
> a.    Horizon's Certificate of Incorporation provides that Horizon has "the
> power to promote the development and redevelopment of blighted areas in
> municipalities and to acquire by purchase or lease of not less than 15 years from
> a public and private owner, plan, develop, business, industrial, commercial,
> cultural or recreational projects under such conditions use, ownership,
> management and control as shall be regulated pursuant to the Urban Renewal
> Nonprofit Corporation Law of 1965…"  Please describe all ways in which
> Horizon has acted in furtherance of this power at any time since 1986.
>
> b.    Please describe in detail Horizon's activities as a charitable and
> benevolent institution.
>
> c.    Please describe in detail how the Board of Directors' decision to convert
> furthers Horizon's existing corporate mission as a charitable and benevolent
> institution.
>
> d.    Did Horizon's Board of Directors take into account Horizon's status as a
> charitable and benevolent institution and its operation as a civic organization for

the promotion of social welfare in its deliberations relating to the effectuation of the conversion? If so, please describe the process and the substance of those discussions, and provide related documents.

e.      Describe how the furtherance of Horizon's status as a charitable and benevolent institution was considered in the presentations made by Horizon's consultants in evaluating the decision to convert.

f.      Describe the social mission of Horizon. Describe the specific activities of Horizon in furtherance of its stated purpose to aid and assist in the development of health programs for the communities it serves and the promotion of social welfare. List the community benefits the corporation provides. Have any community benefits been discontinued in the last 5 years? If so, please describe and explain why. Are any of the community benefits expected to be discontinued or altered in the next 5 years as a result of the conversion? How is the conversion in furtherance of these purposes? What impact will the conversion have on the furtherance of these purposes? Will Horizon commit to maintaining a minimum level of corporate citizenship and charitable contributions post-conversion?

Office of Attorney General Response to Horizon May 7, 2009.

31.     Given Horizon's offensive against community hospitals and the residents which they serve, it is unsurprising that Horizon, after nearly a year, has been unable to acknowledge its charitable purpose or provide the New Jersey Attorney General with any compelling evidence of Horizon's charitable activities.

32.     The Attorney General is not alone in her considerable circumspection of Horizon. Multiple professional healthcare associations have spoken out publicly against Horizon's plans to become a Wall Street company, and most notably have questioned why Horizon, supposedly a charitable entity serving the residents of New Jersey, declines to share in the open much of its plan to convert.

33.     The Chief Executive of the Medical Society of New Jersey decried Horizon's 'black box' approach to its plan, stating:

"In essence, Horizon said that if DOBI and the attorney general wanted the answers to questions, they could come and get them. Is Horizon above the law and public scrutiny? It's like the Internal Revenue Service telling us that we're

- 15 -

going to be audited, and our telling them that the information is confidential — that they can come to our office or home if they really want to see the records. Some of the important things that Horizon has refused to provide are its discussions about selling Horizon post-conversion and what its consultants have told them about the advisability of the conversion."

New Jersey Business.com April 13, 2009.

34.     The New Jersey Hospital Association, QualCare, the Medical Society of New Jersey, the Catholic HealthCare Partnership of NJ, and the Alliance for Advancing Nonprofit Health Care sent a letter on March 26, 2009 to Commissioner Steven Goldman of NJDOBI and to the Attorney General with a detailed analysis of deficiencies with the Horizon scheme.

35.     Indeed, the behavior of Horizon is so troubling that the New Jersey Legislature quickly advanced two bills which would require Horizon to provide far greater detail and justification for its money-grabbing plan as well as to submit to more hearings and to possible intervention by the Public Advocate and other concerned citizens. The Assembly voted favorably on A3729 (Huttle-Wagner) on June 25, 2009, and it was received in the Senate without reference for a second reading on the same date.  The Senate had voted unanimously in favor of an identical bill S-2532 (Weinberg-Gordon) on June 18, 2009.

## II.     Bayonne—A Unique and Indispensible Community Health Care Resource.

36.     Bayonne operates a fully licensed 278-bed, community based, acute-care hospital in continuation of hospital services commenced in the City of Bayonne by its predecessor one hundred and twenty two (122) years ago.  Bayonne is accredited by the Joint Commission on Accreditation of Healthcare Organizations, the American College of Surgeons for Cancer Care, the American Diabetes Association, the College of American Pathologists, the American Association of Blood Banks, and the American College of Radiology; and has membership in the New Jersey Hospital Association.

37.    The previous entity Bayonne Medical Center, Inc., doing business as "Bayonne Medical Center" ("Bayonne's predecessor") began to experience substantial net losses on its operations approximately seven years ago. In or around 2006, the losses of Bayonne's predecessor continued to worsen, and it had no choice but to voluntarily suspend services in its OB/GYN unit in November of 2006.

38.    As a result of Horizon's considerable market power and its illegal conduct, and Bayonne's predecessor's lack of bargaining power, the losses incurred by Bayonne's predecessor were due, in significant part, to Horizon decreasing its levels of reimbursement for services relative to the actual costs of those services.

39.    This decrease in reimbursement relative to costs was visited upon Bayonne's predecessor by private payors, including but not limited to Horizon. Other hospitals also incurred substantial losses during this period and continue to incur substantial losses based on decreasing reimbursement relative to costs. The Governor's Commission on Rationalizing Health Care Resources, also known as the "Reinhardt Commission," issued its Final Report on January 24, 2008. It identified the trend of decreased reimbursement as one of the primary threats to the delivery of health care in New Jersey. The Reinhardt Report, prepared by a broad-based commission of healthcare policy experts, concluded that: "Declining revenues are as much a cause of the financial distress experienced by many of New Jersey's Hospitals as rising expenses. In a long-term trend, both private and public payors have reduced payments and reimbursements for medical services, consumables and resources, and have adopted more restrictive authorization standards. The financial squeeze is exacerbated by the growing impact of non-paying users—the uninsured or under-insured."

- 17 -

40.     By 2007, Bayonne's predecessor had accumulated approximately Eighty Five Million $85 million in losses, and on April 16, 2007, Bayonne's predecessor filed for bankruptcy. Bayonne purchased its predecessor's assets in the context of the predecessor's Bankruptcy proceedings. After an exhausting seven month search for a buyer, Bayonne emerged as the only viable bidder days prior to the Hospital almost closing after WARN letters had been issued to its employees.

41.     Bayonne perfected its purchase of substantially all of the assets of its predecessor by an order of the United States Bankruptcy Court for the District of New Jersey (case no. 07-1595) approving the sale on November 9, 2007, at which time Bayonne and its predecessor proceeded to file a Certificate of Need ("CN") application seeking the approval of the New Jersey Department of Health and Senior Services to transfer ownership of the hospital from Bayonne's predecessor to Bayonne. The transfer became effective on February 1, 2008. In purchasing the facility, Bayonne also saved over 900 jobs in the City of Bayonne.

42.     At a State Health Planning Board meeting held on January 8, 2008, an authorized representative of the Department of Health and Senior Services explained that the Department had reviewed Bayonne's CN application and concluded that the transfer of ownership to Bayonne was in the best interest of the community's residents. "With the decline in service capacity at [Bayonne's predecessor] in the past and their fiscal instability, a gap in health services delivery is inevitable. The action taken by [Bayonne] would fill the service gap before further damage occurs to the health care delivery system in Bayonne." The Department acknowledged that "[t]he steps taken by [Bayonne] to restore and preserve the existing health care services at Bayonne show a genuine commitment [to] working with the community."